**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Randall Knuth,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Paul Revere Life Insurance Company, et al.,<br><br>　　　　　Defendants. | No. CV-14-02387-TUC-RCC (DTF)<br><br>**REPORT AND RECOMMENDATION** |

Before the Court are: (1) Plaintiff's Motion for Partial Summary Judgment Re: Current Disability Status (Doc. 421) and (2) Defendants' Motion for Partial Summary Judgment (Doc. 461[1]). The motions are fully briefed and the Court heard oral argument on January 10, 2017. As more fully set forth below, it is recommended that the District Court, after its review of the record, deny both motions.

**Background**

This case concerns a claim for disability insurance benefits made by Plaintiff Randall Knuth (Knuth) under two (2) separate own-occupation disability policies. The policies were issued by Defendants Paul Revere Life Insurance Company and Provident Life and Accident Company which later became subsidiaries of what is known as Unum (hereinafter, Unum). At the time of the onset of Knuth's alleged disability in January 2013 he was a practicing general dentist. The policies in issue are part of a group of own-occupation policies known as the "Closed Block." Once marketed to doctors, lawyers,

---

[1] (under seal)

and other professionals as the "Cadillac" of disability policies in the 1980s and 1990s, these policies turned out to be financially disastrous for insurers, such as Unum.

**The Motions**

Knuth moves for entry of partial summary judgment determining that he is totally disabled from his occupation of dentistry from August 31, 2015, forward. Unum moves for entry of partial summary judgment determining that it is not liable as a matter of law for either bad faith or punitive damages for its conduct with respect to Knuth's claim.

**The Facts**

The record before the Court is extensive. The parties' various objections to each other's evidence are overruled to the extent that the Court relies on the objected-to evidence. With the exception of Plaintiff's motion to strike Defendants' exhibit 12 (Doc. 495), to the extent that the Court does not rely on the object-to evidence the objections are moot. The following material facts are taken from the parties' Local Rule 56.1 statements.

Knuth alleges that on January 10, 2013, he fell backwards from his truck and landed on his back on his cement driveway. Doc. 422 at ¶ 13, 14. Immediately following the fall Knuth reported experiencing more back pain than he had experienced before the fall. *Id*. at ¶ 15. The day of his fall, Knuth's wife helped his ice his back and he took a prescription painkiller (OxyContin) that he had from an old prescription. Doc. 508 at ¶¶ 88, 89, Ex. 3a at 396. On January 11th, Knuth called his doctor, Dr. Alan K. Rogers (Rogers), and received a prescription for Flexeril. *Id*.; Doc. 469 at ¶ 13. Knuth returned to his dental practice four days after the fall, but he reported that he was unable to hold a bending, twisting position because the position caused him too much pain. Doc. 422 at ¶ 16. On January 17, 2013, Knuth drove to Scottsdale, Arizona, to attend a car show with some friends. Doc. 469 at ¶ 112.

On January 23, 2013, Knuth saw Rogers for treatment. Doc. 469 at ¶ 23. Although Rogers' clinical notes were not provided to the Court, notes in the claim file authored by Deborah Donohue ("Donohue"), a registered nurse employed by Unum, were provided.

These notes interpret Rogers' clinical note of this visit as follows:

> 1-23-2013 – Dr. Rogers – back pain – progressively worsening low back pain and does not feel he can continue working as a dentist. "No fall or injury." He feels he is limited due to back pain and will need retirement. He was referred to Dr. Goldfarb for a second opinion.

Doc. 469 at ¶ 13, 14, 23. Based, in part, on this "no fall or injury" note, Unum now disputes that a fall occurred. *See* Doc. 466 at p. 4, ll. 5-20.

On February 27, 2013, Plaintiff underwent a functional capacity exam (FCE) performed by Dr. Richard Randall (Randall). Again, the Court relies upon Donohue's notes in the claim file, which described the results in relevant part, as follows:

> He is unable to perform any categorical work at this time, even sedentary. He showed an inability to maintain any sustained functional work position in order to function at a rate conducive to gainful employment… He reported a slip and fall on 1/10/2013 and reported he treated himself. He reported he last worked on 1/16/2013. He reported his sitting tolerance to be 10 minutes of 1-5% of an 8 hour day, but reported he drove 2 ½ hours to get here with 2 breaks which would not be consistent with the other statement

Doc. 422, Ex. 4 at 1000.

On March 8, 2013, Unum received Knuth's claim for disability benefits along with a statement from Dr. Rogers. Doc. 422 at ¶¶ 22, 31-32. Disability benefits specialist Robin Rose (Rose) began to investigate the claim by gathering medical records and American Dental Association codes for the types of dental procedures performed by Knuth. *Id.* at ¶ 24, 25. Knuth was interviewed by a field investigator early in the investigation. The field investigator noted that while Knuth sat for 45 minutes during the interview he often shifted in his seat and rested his arms on the table in front of him. *Id.* at ¶¶ 26, 27. Also, Knuth executed two releases, a general release and a financial release. Doc. 508 at ¶ 121.

At some point in the claims process, Unum sent Dr. McFarland (McFarland) a request to answer their questions about the physical demands on Knuth in his dentistry practice. *Id.* at ¶ 124. Knuth had sold his practice to McFarland, but at the time of

Unum's inquire he had been practicing with McFarland as an associate and received a portion of the business profits pursuant to the sales agreement. Doc. 508 at ¶ 128. On March 27, 2013, Knuth spoke with Rose after he discovered Rose was attempting to contact McFarland. He explained to Rose that McFarland was unhappy with the sale of the dental practice and that they (Knuth and McFarland) have a contentious relationship. *Id*. at ¶ 122. Therefore, Knuth told Rose that if she needed anything from McFarland that he would try to get it from McFarland. *Id*. at ¶ 123.

On or about April 10, 2013, Dr. A.J. Philbin (Philbin), an orthopedic surgeon and Unum's on-site physician (OSP), conducted a review of Knuth's medical records. From this review Philbin opined that it would be reasonable for Plaintiff to have restrictions and limitations (R&Ls) for a three month period. Doc. 422 at ¶ 28. On May 1, 2013, Sara McKinnon (McKinnon), Unum's Quality Compliance Consultant (QCC), conducted a management review and noted that a field interview was pending with Knuth's employer "which may provide additional information relating to what's happening with the insured and former partner." Doc. 508 at ¶ 127. On May 10, 2013, a Friday, Knuth sent a facsimile letter to Rose stating,

> It has come to my attention that you have attempted to arrange a meeting with Dr. Mc[F]arland to discuss my disability.  I have not signed an authorization for you to talk with anyone other than treating physicians and three family members.  I have provided you with all financial information, work hour information, type of dentistry information, location of dentistry information, tax returns for money received from [Dr.] Mc[F]arland information, and I cannot conceive of any other information that would cause you to need to speak with Dr. Mc[F]arland or his agents.  I have provided all medical information from my treating doctors you requested as well as all financial information you have requested.  I can not (sic) envision any information you can glean from a discussion with him that you cannot get from the myriad of sources I have already provided.  If there are specific questions that you need answered that can only come from Mc[F]arland, they will need to go through me, and I would be happy to review and act on them immediately in an effort to help you complete your investigation in a timely fashion.  I hope this offer is helpful.  Should you have any concerns or questions please don't hesitate to contact me […].

*Id*. at ¶ 130.  On May 14, 2013, Rose wrote to Knuth stating, in part, "We are in receipt of

your letter dated May 10, 2013, and are in the process of reviewing it." Doc. 508 at ¶ 132. On the same day, Unum interviewed McFarland. *Id*. at ¶ 135. Unum's claims manual instructs employees to stop if an authorization is revoked. *Id*. at ¶ 131.

On May 24, 2013, in-house lawyer Nancy Smith (Smith) documented the claim file as follows,

> With respect to the authorization, I concur with your [Rose's] plan to advise the insured what we had an authorization permitting us to speak with Dr. Farland (sic) and that we spoke with him before he contacted us and that no private information was conveyed to Dr. Farland (sic).

*Id*. at ¶ 139. Rose testified that the reason the interview with McFarland took place is that she was out of the office on Friday (the day Knuth's letter/facsimile was received) and her supervisor, McKinnon, was out on Monday when Rose returned to the office. Consequently, the interview took place before she and McKinnon could discuss Knuth's letter. *Id*. at ¶ 143. McKinnon testified she did not believe Knuth's letter prevented Unum from speaking with McFarland. *Id*. at ¶ 142.

On May 17, 2013, Unum accepted Knuth's claim under a reservation of rights on the basis that his fall in January 2013 exacerbated his preexisting degenerative disc disease. Doc. 422 at ¶¶ 29, 30. On June 13, 2013, Unum lifted the reservation of rights. *Id*. On June 15, 24 and 25, 2013, Unum conducted surveillance on Knuth. *Id*. at ¶ 53. The notable portions of the surveillance video show Knuth (1) getting into his car by lowering himself backwards into the driver's seat while bracing himself on the door and side of the car and (2) sitting on a backless bar stool eating lunch alone. *Id*. at ¶¶ 53, 54.

On August 1, 2013, Knuth's claim was subjected to either a "roundtable" or a "TBA roundtable" Doc. 508 at ¶ 145; Doc. 514 at ¶ 145. "TBA" is an abbreviation for "team based assessment." Doc. 514 at ¶ 145; *see* p.15, *infra*. Present at this TBA roundtable were Philbin, Rose, McKinnon, Andrea Coraccio, and nurse Donohue. Doc. 508 at ¶ 148. A note in the claim file reflects that the file was going to be sent to OSP Philbin for an etiology determination, *i.e*., accident versus sickness. *Id*. at ¶ 149.

On August 7, 2013, Philbin concluded that the R&Ls proposed by Rogers were

not supported. Doc. 508 at ¶ 186. Philbin documented the claim file stating:

> There was no reported witness to the truck falling event and circumstances remain vague as to how he turned over his left ankle and landed flat on his back. There was no trip to the ER, not seen by his doctor. There have been no changes clinically since that falling event other than complaints of pain, no dramatic or significant examination or acute imaging changes on MRI 2-27-13 when compared to 2012 study.

*Id*. Philbin documented that Knuth "appeared tolerant of medications, walks briskly in video with no pain inhibition evident, without ambulatory aids in a community setting to include operation of a vehicle." *Id*.

Three weeks later, on August 28, 2013, Philbin wrote to Rogers asking him whether he agreed that "the etiology of Dr. Knuth's reported condition is a progressive degenerative facet involvement of the lumbar spine at L4-5 with minimal stenosis considering the insured's age, and is not related to a reported truck fall event." *Id*. at ¶ 150. On September 10, 2013, Rogers responded that the etiology of Knuth's reported condition is not totally related to a reported truck fall event. *Id*. at ¶ 151. On this same day, after reviewing Rogers' response to Philbin, Rose asked Philbin, "Is it possible to determine the etiology of his condition?" Philbin responded "Further clarification needed on this salient issue, will send letter to confirm agreement." *Id*. at ¶ 153. In this same document, Philbin noted that Rogers "agrees Knuth's back condition is primarily progressive degenerative condition and not related except to a minor degree to falling from truck event." *Id*. On September 23, 2013, Philbin wrote a second letter to Rogers asking him to agree that:

> Etiology is progressive degenerative medical condition of facet involvement of the lumbar spine at L4-5 with minimal stenosis also considering Insured's age, as being the *PRIMARY AND PRINCIPAL* explanation as to etiology of Insured's reported back condition, but also stating falling event contributed to a minor degree.

*Id*. at ¶ 155. On September 30, 2013, Rogers responded "NO" and said that Knuth "has typical degenerative changes of the spine but would continue to be working had he not had his accident (falling from truck)." *Id*. at ¶ 156. Ultimately, Philbin rejected Rogers'

opinion on etiology stating that "[Rogers] does not provide any support for his opinion, 'would continue to be working' in his reply, also note that AP eschews peer calls." Doc. 508 at ¶ 157.

In October 2013, Andrea Coraccio (Coraccio), Unum's vocational expert, was charged with conducting a vocational review of Knuth's claim. Doc. 422 at ¶ 33. Coraccio agreed that the physical demands of being a dentist include sitting, bending at the neck and waist, twisting, and reaching. However, she did not determine the average amount of time a dentist must bend and twist while performing dental procedures. *Id.* at ¶ 34, 35. Using Philbin's and Benson's restrictions and limitations, Coraccio determined that the demands of Knuth's occupation did not exceed the supported restrictions and limitations. Doc. 508 at ¶ 240.

On November 13, 2013, Knuth advised Rose he had recently received a neurotomy and an epidural steroid injection. *Id.* at ¶ 251. Additional medical records received by Unum from Dr. Jacobs on November 20, 2013, indicate, in part, "not better maybe worse[.]" *Id.* at ¶ 252. On November 23, 2013, Unum received new pain management records from Dr. Matthew Holland (Holland) which evidenced that Knuth received an epidural injection in the L4-5 level on October 3, 2013, and that a three level bilateral radio frequency neurotomy was performed on November 5, 2013. *Id.* at ¶ 253. On November 26, 2013, Rose requested that Philbin review these newly received records. *Id.* at ¶ 255. Philbin completed his review of these records on December 6, 2013 and concluded "R&Ls are unsupported, OSP opinion unchanged." Doc. 422 at ¶ 49; Doc. 508 at ¶ 256.

Because Plaintiff's treating physician and Unum's OSP disagreed, Unum referred the matter to their designated medical officer (DMO) who acts as a "tie-breaker" where a treating physician and OSP disagree. On December 10, 2013, DMO Dr. Susan Benson (Benson), concurred with Philbin's opinion and rejected Rogers' opinion. Doc. 422 at ¶¶ 44, 49. According to records produced in this litigation, Benson has never found Unum's OSP incorrect. In other words, Benson has agreed with the OSP 100% of the time. Doc.

544-2[2] at ¶ 213. Immediately after Benson's decision, on December 11, 2013, Unum terminated Knuth's claim. Doc. 422 at ¶ 52; Doc. 466 at ¶ 52.

Post-termination Knuth engaged a physical therapist, Karen Lunda (Lunda), to conduct a second FCE. Doc. 508 at ¶ 288. On February 26 and 27, 2014, Lunda examined Knuth. During her examination, Lunda had Knuth duplicate the posture required to perform dentistry (leaning forward and twisting) and observed how long he was able to maintain that position. *Id*. at ¶ 289. Lunda determined that after one minute and 2 seconds, she was able to palpate a muscle spasm in Knuth's back. *Id*. at ¶ 290. Lunda's records indicated that the spasm released, but a second spasm occurred less than one minute after resuming this position. *Id*. at ¶ 291. Lunda reported she stopped this test after observing Knuth was in pain. *Id*. at ¶ 292.

On April 22, 2014, Unum received the results of Lunda's FCE. *Id*. at ¶ 294. At or about this same time, Unum also received a letter from Holland which explained that the June 2013 surveillance video demonstrated a gait disturbance and the way that Knuth was shown backing into his car "suggests that he requires assistance with unloading the lumbar spine to perform simple motions such as assumption of the seated position and supports the allegation that he is unable to work at this time." *Id*. at ¶ 295.

Unum sent this new information to Philbin for review. *Id*. at ¶ 298. Philbin's review failed to address Holland's and Rogers' mention of his (Philbin's) interpretation of the surveillance video and his review summarily disregarded Lunda's FCE results. *Id*. at ¶ 300. Philbin did not change his decision that Knuth's R&L's were unsupported. *Id*. at ¶ 299. On May 15, 2014, Unum upheld the decision to terminate benefits over Knuth's objection. *Id*. at ¶ 319. Knuth filed suit on September 30, 2014. Doc. 1.

**Standard of Review**

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Also, a court may grant partial summary judgment where there is no genuine issue

---

[2] (under seal)

of material fact as to a particular claim or portion of that claim. *Id*. A party seeking summary judgment bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Aguilar v. Pacific Orthopedic Medical Group,* 2013 WL 5424896, at *2 (N.D. Cal. 2013) (quoting *Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Id*. (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). (Additional citations omitted.) The judge's sole function is to determine whether there is a genuine issue for trial … credibility determinations, the weighing of evidence, and the drawing of legitimate inference from the facts, are jury functions. *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. at 2511-13.

### Analysis

**Plaintiff's Motion – Knuth's Current Disability Status**

The Social Security Administration found Knuth disabled on May 18, 2015. *See* Doc. 422 at ¶ 63. Thereafter, Unum conducted an IME on Knuth. *Id*. at ¶ 78. Knuth contends there is no genuine issue of material fact that as of the date of the IME he was unable to maintain a "dental posture" so he could perform the material duties of dentistry in the usual and customary way. Therefore, as a matter of law, Knuth was disabled and entitled to coverage.

The insurance contracts at issue are own occupation disability policies. Under Arizona law, a holder of an own occupation disability policy is disabled if she cannot perform the important duties of her own occupation in the usual and customary way. *Radkowsky v. Provident Life & Acc. Ins. Co.,* 993 P.2d 1074, 1076 & n.1 (Ariz. App. 1999); *see also, Nystrom v. Massachusetts Cas. Ins. Co*., 713 P.2d 1266, 1270 (Ariz. App. 1986). At the time he reportedly suffered his fall, Knuth had been practicing dentistry for over 30 years. The usual and customary practice of dentistry requires a dentist to sit while bending forward and twisting. In other words, a dentist must have the

ability to maintain a "dental posture."

As mentioned above, in February of 2014 Lunda performed a second FCE and determined that about a minute after Knuth assumed the dental posture she could feel a muscle spasm in his back. Lunda's FCE was provided to Unum in March 2014. Unum did not reverse its December 2013 decision terminating Knuth's benefits.

On May 18, 2015, the Social Security Administration (SSA) determined that Knuth had been disabled since January 16, 2013. The SSA found Knuth was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment. *See* Doc. 422 at Ex. 14. After Unum received the SSA disability determination from Knuth on June 3, 2015, it did not reinstate Knuth's benefits but requested that he undergo an independent medical examination (IME). On Defendants' motion, the Court ordered Knuth to submit to an IME to determine his condition at the time of the examination, but not retrospectively. *See* Doc. 138. On August 31, 2015, Dr. Berghausen (Berghausen) conducted the IME on Knuth and determined that he could still practice dentistry and was not disabled.

Unum now argues that Berghausen's opinion alone is sufficient to create a jury question on the issue of Knuth's disability on August 31, 2015. Doc. 463 at pp. 6-8. Knuth argues that Berghausen's opinion that his pain was not disabling is unsupported in light of Berghausen's reliance on Lunda's FCE. Therefore, Knuth reasons that Berghausen's opinion does not create a genuine dispute for trial. Doc. 492 at pp. 6-7, ll. 10-20. As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony and it is up to the opposing party to examine the factual basis of the opinion in cross-examination. *Children's Broadcasting Corp v. Walt Disney Co*., 357 F.3d 860, 865 (8th Cir. 2004) (cited with approval in *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004)). The Ninth Circuit has explained that "in the context of a motion for summary judgment, an expert must back up his opinion with specific facts." *Aguilar*, 2013 WL 5424896 at *5, quoting *United States v. Various Slot Machines*, 658 F.2d 697, 700 (9th Cir. 1981). "Put another way, an expert

should 'include how and why the expert reached a particular result, not merely the expert's conclusory opinions … [because] an expert who supplies only an ultimate conclusion with no analysis supplies nothing of value to the judicial process.' " *Id*., quoting *Finwall v. City of Chicago*, 239 F.RD. 494, 501 (N.D. Ill. 2006).

After a thorough review of Berghausen's IME report and deposition testimony, the Court determines that his opinion has a sufficient foundation. According to Berghausen, after he examined Knuth and reviewed Lunda's FCE, he concluded that Knuth's pain was not disabling and did not prevent him from practicing of dentistry. Berghausen testified the level of pain which allegedly occurs to Knuth shortly after he assumes a dental posture is subjective. Berghausen's opinion was based upon his personal observations of Knuth during the IME and his 30 years practice as an orthopedic surgeon. *See e.g*., Doc. 466-25, Ex. 15 at p. 81, ll. 3-7; p. 91, ll. 15-23. *See also*, Doc. 466-2 at Ex. 18 at pp. 18-20.

The Court determines that there is a genuine dispute of material fact regarding Knuth's disability status and will recommend that the District Court deny Plaintiff's motion for partial summary judgment.

**Defendants' Motion - Bad Faith and Punitive Damages**

Unum asks the Court to hold that it cannot be liable for bad faith and punitive damages for its termination of Knuth's claim. Unum points out there were discrepancies in Knuth's reporting the fall, Rogers was unwilling to communicate by phone with insurance representatives, and there was conflicting information regarding why Knuth stopped working. Unum argues Knuth's claim was subjected to its thorough claims review process and that process resulted in a decision to terminate benefits. At oral argument, Unum's counsel detailed the claims process, describing the levels of review applied to a claim. The thrust of Unum's argument was to rhetorically ask why would Unum go through their comprehensive process if its intent was to deny Knuth's claim at the outset. *See* Doc. 550 at pp. 69-71, ll. 18-14.

Knuth argued at the evidentiary hearing on the motion, that Unum's procedure

used to deny the claim missed the point of plaintiff's assertion of bad faith. Knuth asserts the bad faith claim arises from Unum's decision to terminate his claim in the face of evidence of disability contained in the claim file, not the procedure used to accomplish the wrongful termination. Doc. 550 at pp. 80-81, ll. 20-6. Knuth asserts his claim is valued at about $2 million dollars and it is within the "Closed Block" claims, which Unum has targeted for closure. Knuth argues there is evidence that Unum improperly conducted an interview of McFarland, lied about the circumstances surrounding the interview, and that Unum ignored evidence of pain, including the behavior depicted on the surveillance video, to support a wrongful denial of his claim. Knuth also points to evidence that his claim was subjected to "roundtables," a procedure, questioned by other courts, to limit the amount Unum would have to pay on his claim. Knuth points to further evidence that Unum attempted to influence Rogers' medical opinion in an effort to limit its financial exposure on the claim. When Unum failed to influence Rogers, it rejected his opinion, an act that was contrary to its claims manual. Knuth points to other evidence that Unum's vocational reviewer failed to consider Rogers' opinion and that it terminated his claim before it reviewed current medical records. Knuth asserts that this and other evidence demonstrates a pattern of conduct by Unum to disregard their duty of good faith to the insured.

Insurance Bad Faith Standard

"An insurance contract is not an ordinary commercial bargain; implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured." *Temple v. Hartford Ins. Co. of Midwest*, 40 F.Supp.3d 1156, 1165 (D. Ariz. 2014) (quoting *Zilisch v. State Farm Mut. Auto. Ins.*, 995 P.2d 276, 279 (2000)). Although insurers do not owe fiduciary duties to their insured, they owe duties of a fiduciary nature, which includes equal consideration, fairness and honesty. *Id*. (citing *Zilisch*, 995 P.2d at 279). An insurer has an obligation to conduct a prompt and adequate investigation, to act reasonably in evaluating its insured's claim, and to promptly pay a legitimate claim. *Id*. (citing *Zilisch*, 995 P.2d at 280).

1  "An insurer acts in bad faith when it unreasonably investigates, evaluates, or processes a claim (an 'objective' test), and either knows it is acting unreasonably or acts with such reckless disregard that such knowledge may be imputed to it (a 'subjective' test)." *Id*. (quoting *Nardelli v. Metro. Group Prop & Cas. Ins. Co*., 227 P.3d 789, 794-95 (App. 2012) (citing *Zilisch*, 995 P.2d at 280). If an insurer acted objectively unreasonable, then the court moves to the subjective inquiry and determines if the insurer knew or was conscious that its conduct was unreasonable or acted with such reckless disregard that such knowledge may be imputed to it. *Id*. at 1165-66. (Citation omitted.) If an insured offers no significantly probative evidence that calls into question the insurer's subjective belief in fair debatability, the court may rule on the issue as a matter of law. *Id*. (citing *Knoell v. Metropolitan Life Ins. Co*., 163 F.Supp.2d 1072, 1076 (D. Ariz. 2001). (Additional citations omitted.)

Discussion

Unum argues that it did nothing improper when it interviewed McFarland, reasoning that it has a responsibility to interview key witnesses. Doc. 513 at pp. 1-3. The Court agrees that Unum has a responsibility to interview witnesses, but here there are credibility issues surrounding Unum's receipt of Knuth's letter telling it to not interview McFarland, whether Unum knowingly failed to comply with a revoked authorization, and what was discussed with McFarland in the interview. Doc. 507 at pp. 6-7. Under Arizona law, an insured cannot reveal confidential information to a third party when an insured revokes his authorization. *See* ARIZ.REV.STAT. § 20-2113. Whether Knuth revoked his authorization and, if he did, whether Unum complied with Knuth's revoked authorization and Arizona law when it interviewed McFarland are for the jury to decide.

Unum argues that "surveillance is a valuable, widely accepted and necessary investigative tool, particularly when an insured's claim turns on his subjective report." Doc. 513 at p. 3, ll. 20-23. Knuth does not dispute this position but points out that the issue is Unum's interpretation of the surveillance footage and whether its contents were given fair consideration. Philbin testified that Knuth's sitting leaning forward with his

1  weight on his arms is how people with facet pain (such as Knuth) sit to relieve pain.
2  Despite this testimony, this interpretation of Knuth's behavior is not referenced by either
3  Benson or Philbin in their written reports. In fact, Rose testified that Philbin's summary
4  of what he had seen on the surveillance video was inaccurate because there was evidence
5  of pain behavior on the video. It is a jury question whether this pain evidence was
6  willfully ignored or suppressed by Unum.

7  Next, Knuth points out that there is evidence that Philbin tried to influence Rogers
8  with respect to the etiology of his condition and that Unum improperly disregarded
9  Rogers' opinion. As laid out above, Philbin twice wrote to Rogers on the issue of
10 etiology asking him to agree that Knuth's condition resulted from an illness (a
11 degenerative back condition) and not an accident (the January 10th fall). Unum expects
12 ███████████████████████████████████████████████████████████
13 ███████████████████████████████████████████████████ Doc. 544-2
14 at ¶ 160. Etiology is important to Unum because under the terms of one of Knuth's
15 policies benefits cease when he reaches 65 if his condition is as a result of illness. Doc.
16 508 at ¶ 147. While Philbin has denied knowing what effect that a determination of
17 etiology would have on a claim, Doc. 508 at ¶ 158, ███████████████
18 ███████████████████████████████████████ Doc. 544-2 at ¶
19 159. Philbin's credibility is for the jury to weigh and whether this is evidence of bad faith
20 is also for the jury.

21 Unum is required to give significant weight to an attending physician's opinion if
22 the physician is properly licensed and the claimed medical condition falls within the
23 physician's customary area of practice and before Unum may reject an attending
24 physician's opinion, there must be specific reasons why the opinion is (1) not well-
25 supported by medically acceptable clinical or diagnostic standards and (2) inconsistent
26 with other substantial evidence in the record. Doc. 422 at ¶ 60. All agree that Rogers was
27 qualified to render his opinion, that he was properly licensed, that he was Knuth's
28 primary care physician and at all relevant times he concluded that Knuth was unable to

perform his occupation of dentistry. *Id*. at ¶ 55, 61. Despite this, Unum rejected Rogers' opinion based upon Philbin's review of Knuth's medical records and the June 2013 surveillance video. Whether Philbin's review provides an adequate basis to terminate the claim or that it is evidence of a pattern of conduct designed to conceal a wrongful termination is for the jury to decide.

Unum denied Knuth's claim on December 11, 2013. On November 23, 2015, Unum received additional relevant medical records. Doc. 508 at ¶ 253. One day earlier, Knuth's claim is identified as a "Resolution" in Unum's claims management system. *Id*. at ¶ 254. On November 26, 2015, Rose requested that Philbin review the new medical records and Philbin responded on December 6, 2015. However, on December 2nd, McKinnon sent an email to QCC Cahill telling her that Knuth's file will be coming back to her at some point for sign off. *Id*. at ¶ 257. Knuth argues this December 2nd email evidences that Unum's denial of Knuth's claim was a fait accompli as evidence provided to the Court is that ninety-nine percent of the files that are sent to Cahill are targeted for termination. *Id*. at ¶ 260. Unum argues the email was sent to manage workload. S*ee* Doc. 513 at p. 10, ll. 8-13. Again, whether these facts support or refute Knuth's claim, is a jury decision.

Unum has been criticized for conducting roundtables on claims. *See, e.g., Hangarter v. Provident Life and Acc. Ins. Co.,* 373 F.2d 998, 1011 (9th Cir. 2004) (bad faith found where insurer roundtabled claims). Knuth argues his claim was roundtabled twice. After the first roundtable Philbin twice tried to influence Rogers on the etiology of Knuth's condition. At the second roundtable, some 15 months after Knuth's claim was initially made, the topic of having Knuth's claim reviewed by Unum's in-house behavioral health specialist was discussed. Doc. 508 at ¶¶ 301-304. Knuth argues this second roundtable was part of a continued effort to come up with a way to terminate his claim. Unum argues that these roundtables were actually team based assessments performed as a part of Unum's duty to its insured during the claims handling process. Whether these so-called roundtables were designed by Unum's to insure proper claims

handling or a subterfuge designed to cover wrongful terminations is a jury question.

Knuth argues Unum's vocational reviewer, Coraccio, failed to consider failed to consider the opinion of Knuth's primary care physician (Rogers). Instead, Knuth claims that Coraccio only considered Unum's the in-house physicians' opinions (here, Philbin) regarding an insured's restrictions and limitation. Doc. 508 at ¶¶ 235-237. Unum argues that there is nothing wrong with this procedure because once medical personnel determine what restrictions and limitations are supported then Coraccio must analyze how those restrictions and limitations impact an insured's ability to perform his occupational duties. Doc. 513 at p. 8, ll. 24-26. The body of information that Unum made available to its vocational reviewer is relevant to a jury's consideration of whether Unum willfully ignored evidence of its insured's disability in order to wrongfully terminate coverage.

Punitive Damages Standard

"In a bad faith tort case against an insurance company, punitive damages may only be awarded if the evidence reflects 'something more' than the conduct necessary to establish the tort." *Id*. (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 576 (1986). *Rawlings* held:

> We restrict [the availability of punitive damages] to those cases in which the defendants' wrongful conduct was guided by evil motives. Thus to obtain punitive damages, [the] plaintiff must prove that [the] defendant's evil hand was guided by an evil mind…[P]unitive damages will be awarded on proof from which the jury may find that the defendant was 'aware of and consciously disregard[ed] a substantial and unjustifiable risk that' significant harm would occur.

*Id*. (quoting *Rawlings*, 726 P.2d at 578. *See also Linthicum v. Nationwide Life Ins. Co*., 723 P.2d 675, 681 (App. 1986) ("Punitive damages are recoverable in a bad faith action by a showing that the defendant was consciously aware of the needs and rights of the insured yet ignored its obligations to its insured.") Summary judgment for the defendant on the issue of punitive damages must be denied if a reasonable jury could find the requisite evil mind by clear and convincing evidence. *Id*. (citing *Thompson v. Better-Built Aluminum Prod. Co*., 832 P.2d 203, 211 (1992)).

Discussion

Taking all the evidence into consideration and viewing it in the light most favorable to Knuth, there is evidence from which a reasonable jury could conclude that Unum knowingly ignored evidence favorable to its insured and attempted to create evidence unfavorable to its insured with the intent to not pay benefits under two insurance policies. Such conduct is contrary to the fiduciary-like obligations that an insurer owes to its insured and evidences an evil hand guided by an evil mind. The Court will recommend that Defendants' motion be denied.

**Conclusion**

In light of the foregoing, it is **RECOMMENDED** that the District Court, after it independent review of the record, **DENY** Plaintiff's Motion for Partial Summary Judgment re: Disability (Doc. 421) and **DENY** Defendants' Motion for Partial Summary Judgment (Doc. 461).

Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file written objections within 14 days of being served with a copy of the Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the District Court. If objections are not timely filed, they may be deemed waived.  If objections are filed, the parties should use the following case number: **4:14-cv-02387-RCC**.

Dated this 6th day of February, 2017.

_D. Thomas Ferraro_
United States Magistrate Judge